# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ANDERSON DIVISION

| | |
|---|---|
| JOSHUA BREGY,<br><br>   *Plaintiff,*<br><br>  v.<br><br>BOARD OF TRUSTEES OF CLEMSON UNIVERSITY; ROBERT JONES, in his individual and official capacity as provost of Clemson University; JAMES CLEMENTS, in his individual and official capacity as president of Clemson University; KIM WILKERSON, in her individual and official capacity as Chair of the Clemson Board of Trustees; JOHN MCCARTER JR., DAVID DUKES, NIKKI HALEY, RONALD LEE, LOUIS LYNN, PATRICIA MCABEE, SMYTH MCKISSICK, ROBERT PEELER, CHERI PHYFER, MARK RICHARDSON, WILLIAM SMITH JR., and JOSEPH SWANN, in their individual and official capacities as members of the Clemson Board of Trustees,<br><br>   *Defendants.* | Case No. 8:25-cv-12810-JDA |

## MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACT ...................................................................................... 1

   I.   Plaintiff was a high-performing Assistant Professor at Clemson University, a state institution. ....................................................................... 1

   II.   Charlie Kirk was a public figure whose murder sparked important public discourse. ....... 1

   III.   Plaintiff was fired for nonviolent, extramural political speech about Charlie Kirk. ........... 3

      A.   Plaintiff reposted a measured, nonviolent message on his personal Facebook. ........... 3

      B.   Lawmakers made multiple, explicit threats to defund Clemson University unless it fired Plaintiff. .................................................................. 5

      C.   Defendants fired Plaintiff because of external disapproval of Plaintiff's viewpoint. . 12

      D.   Plaintiff's speech did not disrupt internal affairs at Clemson. ..................................... 12

   IV.   Plaintiff is suffering irreparable harm because of Defendants' actions. ........................... 14

LEGAL STANDARD ......................................................................................... 14

ARGUMENT ....................................................................................................... 15

   I.   Plaintiff is likely to prevail in his First Amendment retaliation claim. ............................ 15

      A.   Dr. Bregy's Facebook post was protected speech. ....................................................... 16

      B.   Dr. Bregy was fired because of the content of his Facebook post. .............................. 18

      C.   The *Pickering-Connick* balancing test heavily favors Dr. Bregy. ............................... 18

   II.   Plaintiff will suffer irreparable harm absent preliminary relief. ....................................... 27

   III.   The balance of equities and public interest strongly favor injunctive relief. .................... 28

CONCLUSION ................................................................................................... 29

## INTRODUCTION

Plaintiff Dr. Joshua Bregy, an Assistant Professor at Clemson University, was fired for reposting a political message about Charlie Kirk on his personal Facebook page. Because his dismissal caused irreparable harm and violated his constitutional right to speak out, as a citizen, on matters of public importance, the Court should grant preliminary injunctive relief. *See, e.g.*, *Hook v. Rave*, No. 4:25-cv-04188-KES, 2025 WL 2720978 (D.S.D. Sept. 24, 2025) (reinstating a university professor who was placed on administrative leave after posting on Facebook: "I don't give a flying f*** about this Kirk person").

## STATEMENT OF FACT

### I.    Plaintiff was a high-performing Assistant Professor at Clemson University, a state institution.

Dr. Joshua Bregy is a climate scientist and an expert in the reconstruction of hurricane records. Bregy Decl. at ¶ 2. He has a dual Ph.D. in Earth and Atmospheric Sciences and Geography from Indiana University and an M.S. in Marine Science, with a special emphasis on Geological Oceanography, from the University of Southern Mississippi. *Id.* at ¶ 3. Since January 2023, when Dr. Bregy started as an Assistant Professor at Clemson University, he has been—in the words of Defendant Provost Jones—"a great teacher." *Id.* at ¶ 19. According to leaders in his Department, Dr. Bregy is a brilliant and valuable researcher, is well-liked and respected by both students and fellow faculty, and was on track to achieve tenure. Freedman Decl. at ¶¶ 6, 8–13.

### II.    Charlie Kirk was a public figure whose murder sparked important public discourse.

Charlie Kirk was a conservative activist who, at the age of 18, founded Turning Point USA to organize young people "to restore traditional American values like patriotism, respect for life, liberty, family, and fiscal responsibility."[1] According to Kirk, he "founded Turning Point USA to take the fight for ideological diversity directly to a progressive stronghold: the nation's

---

[1] *About*, Turning Point USA (last accessed Oct. 3, 2025), https://tpusa.com/about/.

leading colleges and universities."[2] Kirk was known for expressing his views—including on divisive topics like race, gender, and guns—unapologetically and with overt disdain for "political correctness." He is infamous for comments like:

– "We need to have a Nuremberg-style trial for every gender-affirming clinic doctor. We need it immediately."[3]

– "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"[4]

– "Reject feminism. Submit to your husband, Taylor [Swift]. You're not in charge."[5]

– "Islam is the sword the left is using to slit the throat of America."[6]

– "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational."[7]

– "I can't stand the word empathy, actually. I think empathy is a made-up, new-age term that does a lot of damage."[8]

– Haitians in Alabama "are raping your women and hunting you down at night."[9]

---

[2] Charlie Kirk, *Conservatives Must Fight for Their Voice*, Salisbury Post (July 14, 2019), https://www.salisburypost.com/2019/07/14/charlie-kirk-conservatives-must-fight-for-voice/.

[3] Chris Stein, *Charlie Kirk in His Own Words: 'Prowling Blacks' and 'the Great Replacement Strategy,'* The Guardian (Sept. 11, 2025), https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Charlie Kirk warns that Haitian migrants "will become your masters" if Trump loses the election*, Media Matters (Sept. 27, 2024), https://www.mediamatters.org/charlie-kirk/charlie-kirk-warns-haitian-migrants-will-become-your-masters-if-trump-loses-election

On Wednesday, September 10, 2025, Kirk was shot and killed while speaking at an event at Utah Valley University. Kirk's assassination caused an uproar, especially on social media. Some responses lionized Kirk as a paragon of civil debate,[10] while others recalled speech by Kirk that they deemed harmful and balked at the idea of empathizing with a person who mocked the idea of empathy.[11]

As the social media firestorm ignited, conservative groups started identifying and compiling posts by educators and other public employees that were critical of Kirk or that did not demonstrate sufficient sorrow over his death.[12] The posts were then reposted and demonized by political leaders, who then called for the employees to be terminated.

### III. Plaintiff was fired for nonviolent, extramural political speech about Charlie Kirk.

A. <u>Plaintiff reposted a measured, nonviolent message on his personal Facebook.</u>

Plaintiff has a personal Facebook account and does not use it to interact with current students or university colleagues. Bregy Decl. at ¶ 7. Plaintiff's Facebook privacy settings are set so that his posts are only visible to "friends." *Id.* at ¶ 8.

---

[10] *See, e.g.*, *President Trump Joins Nation in Celebrating Charlie Kirk's Enduring Legacy*, The White House (Sept. 22, 2025), https://www.whitehouse.gov/articles/2025/09/president-trump-joins-in-celebrating-charlie-kirks-enduring-legacy/ ("On that terrible day, September 10th, 2025, our greatest evangelist for American liberty became immortal. He's a martyr now for American freedom.")

[11] *See, e.g.*, Ta-Nehisi Coates, *Charlie Kirk, Redeemed: A Political Class Finds its Lost Cause*, Vanity Fair (Sept. 16, 2025), https://www.vanityfair.com/news/story/charlie-kirk-ezra-klein-tanehisi-coates ("Kirk subscribed to some of the most disreputable and harmful beliefs that this country has ever known.").

[12] *See, e.g.*, Miles Klee, *Website Id'ing People as Charlie Kirk's 'Murderers' Rebrands—then Vanishes*, Rolling Stone (Sept. 18, 2025), https://www.rollingstone.com/culture/culture-features/charlie-kirk-murderers-site-defamation-1235429785/ (discussing charliesmurders.com, "a searchable database of 20,000 people celebrating Charlie Kirk's murder" that provided names and photos, personal information such as an individual's social media handles, employer, city of residence, and email address); Tess Owen, *Far-right Commentators Echo Trump in Calling for 'Vengeance and Retribution' for Charlie Kirk's Death*, The Guardian (Sept. 11, 2025), https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-shooting-death-trump-reaction.

After news broke about Kirk's death, reactions to it were trending across all major social media platforms. Amidst that discourse, Dr. Bregy reposted another person's Facebook post. *Id.* at ¶ 10. The post explicitly disavowed violence and "grieve[d] for Kirk's family and friends" while also disagreeing with some of Kirk's and his followers' political opinions. In full, the post said:

> Let me preface this post by saying that violence is never okay and as much as I dislike someone and their cruel ideas, I would never want their life to be taken in an act of violence. Democracy should be built on ideas, not force. But I AM going to say this: If anyone thinks that a reasonable price for the second amendment is countless innocent lives, and then that person has the cold-heartedness and audacity to say that empathy is likened to a social disease, they will get no protracted sympathy from me. Unfriend me if you don't like hearing this simple truth. I'll never advocate for violence in any form, but it sounds to me like karma is sometimes swift and ironic. As Kirk said, "play certain games, win certain prizes."

> Moreover, the disgusting double standard for those on the "other side of the political line" is insane. Where was the outrage from the conservatives when Melissa Hortman, her husband, and even their dog was murdered in an act of political violence? Where were the thoughts and prayers from those who are outraged now? And why is there already a call from certain conservatives for retribution and violence? Doesn't that say too much about what cruelty awaits in their vengeance?

> Maybe you think I'm cruel too, but I'll say this also – I truly grieve for Kirk's family and friends. No one deserves to go through tragic loss like that. No one should be gunned down – not a school child, not an influencer, not a politician – no one. But am I going to allow people to make a martyr out of a flawed human being whose rhetoric caused notable damage? Not a chance.

Bregy Decl., Ex. B

Because the original post was "public," Plaintiff's repost was similarly visible to all Facebook users. Bregy Decl. at ¶ 11. A few hours after making the post, Plaintiff made the post private. *Id.* at ¶ 12. The next morning, at the request of University officials, he deleted the post entirely. *Id.* at ¶ 13.

B.    <u>Lawmakers made multiple, explicit threats to defund Clemson University unless it fired Plaintiff.</u>

Sometime after Plaintiff removed his Facebook post from public view, it was reposted on Twitter[13] by @ClemsonCRs, the official account of the Clemson College Republicans. The post included a partial screenshot of Dr. Bregy's Facebook post (with two sentences highlighted), along with two other pictures displaying Plaintiff's affirmance that "Climate Change = Real" and his support of "Black Lives Matter." The @ClemsonCRs post decried Dr. Bregy as "ANOTHER leftist assistant professor," and alleged that his "now deleted" post "assent[ed] to the idea that Kirk's assassination is a result of KARMA."



Several politicians quickly jumped on the bandwagon. The following morning, Friday, September 12, they began sharing Dr. Bregy's since-deleted post to their much-larger audience

---

[13] Twitter is currently known as "X."

and pressuring Clemson University to fire him. In doing so, those lawmakers referenced Dr. Bregy's perceived political views, including calling him a "Leftist indoctrinator" and a "radical."



That afternoon, Clemson issued a public statement calling for "mutual respect, integrity, and personal responsibility," and affirming its commitment to "the principles of the U.S. Constitution, including the protection of free speech." Notably, in 2023, the Clemson Board of Trustees unanimously adopted the core principles contained in the "Report of the Committee on Freedom of Expression" from the University of Chicago.[14] By doing so, Clemson "guarantee[d] all members of the University community the *broadest possible latitude* to speak, write, listen, challenge, and learn," and resolved that "concerns about civility and mutual respect can never be used as a justification for closing off discussion of ideas, however offensive or disagreeable those ideas may be to some members of our community."[15]

---

[14] *Clemson University Statement on Freedom of Speech*, Clemson (last accessed Oct. 3, 2025), https://www.clemson.edu/administration/bot/about/free-speech-statement.html.

[15] *Report on the Committee of Free Expression*, University of Chicago (last accessed Oct. 3, 2025), https://tinyurl.com/bdfz35fb.



Clemson's refusal to immediately cave to the online directives provoked outrage and overt threats, many tied to Dr. Bregy's perceived political beliefs, including calls on Clemson to "Defund the Left"[16] and "rescue this institution from . . . tone-deaf woketopians."[17]

Representative April Cromer even went in person to Clemson University to stand under a tree and hold a sign that said: "FIRE VILLAVER, NEWBERRY & BREGY."[18] In an interview from Clemson with WSPA 7 News, Cromer told reporters that Clemson should "fire all three employees and make sure that there's no severance, no pay, and make sure that people on

---

[16] @Jscottpace, X [Twitter] (Sept. 12, 2025), https://tinyurl.com/7ezcsdbn.

[17] @RussellFrySC, X [Twitter] (Sept. 12, 2025), https://tinyurl.com/ye5h9jvc.

[18] WSPA 7News, *Charlie Kirk Vigil Sparks Campus Fallout / Clemson Fires Employee Over Controversial Posts*, YouTube, at 4:13 (Sept. 16, 2025), https://tinyurl.com/yuyuwf6d.

campus and across South Carolina know that there will be consequences and zero tolerance."[19]

Adding institutional heft to those coercive social media posts, the President of the South Carolina State Senate, Speaker of the South Carolina House of Representatives, Chairman of Finance for the South Carolina Senate, and Chairman of Ways and Means for the South Carolina House of Representatives sent a letter on official stationery to the Clemson University Board of Trustees "urg[ing]" them to "take immediate and appropriate action . . . to ensure the University and its employees maintain the trust and confidence of South Carolinians." The choice of signatories—and their corresponding legislative authority and control over Clemson's budget—made the letter's message inescapably clear: fire Joshua Bregy and Melvin Villaver, or we will cut Clemson's funding.

By Saturday, September 13, Clemson had started backpedaling from its commitment to "free speech." In a mid-day post, the University promised a "full review . . . of the social media activity that has been brought to our attention," and asserted that "[e]ach case is being evaluated individually."



---

[19] *Id.*



But promising individualized investigations did not quench the thirst for retaliation. The threats to defund Clemson continued. In the words of Representative Cromer, "[w]hat good is having a GOP supermajority if we don't use it?!" Even President Trump jumped into the fray, reposting Representative Pace's call to "Defund Clemson."





9

By Monday afternoon, Clemson had retreated further, issuing a third statement—again, on social media—declaring that it fired one employee and removed two faculty members (including Plaintiff) from their duties "pending further investigation."



The Majority Leader of the South Carolina House GOP, Defendant Davey Hiott, celebrated the first firing but vowed to "deal with how Clemson faltered on this issue":



C.    <u>Defendants fired Plaintiff because of external disapproval of Plaintiff's viewpoint.</u>

The same day it outlined a "pending investigation" into Dr. Bregy, Defendants decided to fire him. In a phone call at around 7pm, Defendant Provost Jones told Dr. Bregy that although Plaintiff is a "great teacher" and Jones regrets the decision, that the University was dismissing him for cause. *See* Bregy Decl. at ¶ 19. Plaintiff wept.

The following morning, Tuesday, September 16, Defendant Jones emailed a termination letter to Dr. Bregy informing him he had been dismissed, "effective September 15," for "blatantly unprofessional conduct and conduct seriously prejudicial to the University." The termination letter cited three sentences of Dr. Bregy's original post—the same excerpt repeatedly parroted by irate lawmakers online. Bregy Decl., Ex. C. In the letter, Defendant Jones also cursorily claimed that Dr. Bregy's post had "irretrievably jeopardized [his] ability to serve as an intellectual guide and counselor to students" and undermined his "professional fitness to continue to serve as a faculty member and . . . ability to be effective in the classroom." *Id.*

Less than an hour later, Clemson announced it had fired both faculty members (Plaintiff and Dr. Melvin Villaver) whose social media posts had inflamed the online mob. The announcement was met with cheers from the outspoken politicians, who claimed responsibility for Dr. Bregy's and another professor's firings. Representative Cromer reposed the South Carolina Freedom Caucus's tweet claiming, "We won."[20]

D.    <u>Plaintiff's speech did not disrupt internal affairs at Clemson.</u>

There is no evidence that Plaintiff's Facebook post impeded any of his professional responsibilities at Clemson. His research was not interrupted, and Dr. Bregy had no scheduled teaching responsibilities between when his repost went viral and when he was terminated. Bregy Decl. at ¶ 14. On Friday, September 12, Dr. Bregy had two regularly-scheduled meetings: a faculty meeting and a meeting with his two faculty advisors. *Id.* at ¶¶ 16–18. Those meetings were after Plaintiff's Facebook post triggered outrage on social media.

---

[20] @AprilCromerSC, X [Twitter] (Sept. 16, 2025), https://tinyurl.com/bp52n8up.

At 1:30pm, Plaintiff attended his faculty meeting. The meeting was not interrupted or disrupted in any way by the Facebook post or by anyone's feelings about his post. Dr. Bregy's department chair, Debora Rodrigues, mentioned to the faculty that it would be prudent for folks to be careful on social media. Aside from that, the faculty meeting did not include any mention of Dr. Bregy's post. *Id.* at ¶ 17.

At 2:30pm, Plaintiff met with his faculty advisors, Brian Powell and Alex Pullen. The three of them discussed Dr. Bregy's post and the university's likely reaction. Plaintiff's faculty advisors supported Plaintiff, were not troubled by his Facebook post, and felt optimistic that the whole thing would blow over quickly. *Id.* at ¶ 18.

If anything, it is the University's decision to dismiss Dr. Bregy that has provoked internal disruption. Students and faculty in the Department of Environmental Engineering and Earth Sciences strongly opposed Dr. Bregy's termination. Dr. David Freedman, a long-tenured Clemson professor and previous chair of the Department, spoke to many of his colleagues about Dr. Bregy's Facebook post. Freedman Decl. at ¶ 19. According to Dr. Freedman, the "post did not impair harmony amongst faculty within the Department of Environmental Engineering and Earth Sciences. In fact, . . . I observed uniform dismay over the way that Dr. Bregy was being unjustly treated." *Id.* at ¶ 21(a). To Dr. Freedman's knowledge, no student, staff, or faculty member within the department expressed any desire for Dr. Bregy to be reprimanded in any way—much less fired. *Id.* at ¶ 19.

Multiple students have reached out to Dr. Bregy to lament his dismissal and to offer support. One of Plaintiff's current students is a member of the Clemson College Republicans group. That student reached out to Dr. Bregy by email to explain that he opposed the views expressed in the Facebook post but still thought it would be wrong for Bregy to get in trouble for his speech. That information was known to Provost Jones before he fired Plaintiff.

A Clemson alumnus started a GoFundMe for Dr. Bregy that has already raised more than $12,000. *See id.* at ¶ 29. Many Clemson students, faculty, and staff have donated to that fundraiser to express their support for Dr. Bregy. *Id.* at ¶ 30. A few individuals even wrote notes

of support on Dr. Bregy's GoFundMe page. Professor Christopher Parkinson, the Director of the Bioinformatics and Genomics Facility at Clemson, made a donation and posted: "Stand up for free speech and our students!!!" *Defend Academic Freedom: Help Dr. Bregy*, GoFundMe (last accessed Oct. 6, 2025), https://tinyurl.com/2bb2rne5. One former student, along with their donation, wrote: "I believe in my undergraduate research advisor to succeed and defend himself!" *Id.*

### IV.     Plaintiff is suffering irreparable harm because of Defendants' actions.

Beyond the violation of his First Amendment rights, *see infra* Arg. I, and the economic harms that accompany any wrongful termination, Dr. Bregy is also experiencing several distinct irreparable harms.

To start, the wrongful termination stalls Plaintiff's important research about oceanography and climate change. *Id.* at ¶¶ 5, 24. The research benefits humanity and is funded by entities that are external to Clemson. If Plaintiff fails to make progress on the research for which he received funding, he will suffer diminished career prospects and reputational harm.

Defendants' dismissal "for cause" adds further reputational harm. Defendants fired Plaintiff based on their view that he acted "unprofessionally" and lacked the "professional fitness to continue to serve as a faculty member." Bregy Decl., Ex. C. That action causes professional and reputational harms that will follow Dr. Bregy throughout his career and which impede his ability to find gainful employment in his field and secure funding for his research. *Id.* at ¶ 25.

Finally, Plaintiff's dismissal has destroyed his opportunity to receive a prestigious and highly competitive Faculty Early Career Development (CAREER) grant from the U.S. National Science Foundation (NSF). Bregy Decl. at ¶ 23. Unless he is reinstated at Clemson where he can continue his research, he will permanently lose out on that opportunity. *Id.*

### LEGAL STANDARD

To obtain a preliminary injunction, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

14

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

ARGUMENT

## I.     Plaintiff is likely to prevail in his First Amendment retaliation claim.

"It is well settled that citizens do not relinquish all of their First Amendment rights by virtue of accepting public employment." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000). That said, public employers wield "greater authority to restrict the speech of its employees" than the State has "to restrict the speech of the citizenry as a whole." *Id.*

Speech retaliation claims brought by public employees like Dr. Bregy are governed by the *Pickering-Connick* interest balancing test. To prevail, Plaintiff must first show that his Facebook post was protected by the First Amendment. To do so, he must establish that the post (a) "was made as a citizen" and not "pursuant to [his] duties" as a Clemson University employee; and (b) that his speech "addressed a matter of interest to the community." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017); *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006). Second, he must prove "a sufficient causal nexus between the protected speech and the retaliatory employment action." *Ridpath v. Bd. of Governors*, 447 F.3d 292, 316 (4th Cir. 2006); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977).

If Plaintiff establishes that he was terminated because of his protected speech, the burden then flips to the government to "justify[] the discharge on legitimate grounds." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). To do so, Defendants must show that its interests in, *inter alia*, "harmony among co-workers," "the performance of the public employee's duties," and "the operation of the [university]," somehow "outweigh" Dr. Bregy's First Amendment right to engage in core political speech. *See McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998) (listing non-exhaustive interests that are relevant to *Pickering* balancing). Plaintiff is likely to prevail under the *Pickering-Connick* test.

A.     <u>Dr. Bregy's Facebook post was protected speech.</u>

The public assassination of Charlie Kirk at Utah Valley University on September 10, 2025, sparked a vigorous public debate about political violence and about Kirk's legacy. In the wake of his death, some glorified Kirk as a saint or a martyr. Others decried his platform and legacy as bigoted, racist, and calloused. Some called for retribution and vengeance, while others called for leaders to deescalate their rhetoric and to embrace our shared humanity. Still others responded to the reactions, emphasizing the seeming double standard between politicians' reactions to Kirk's assassination compared to recent school shootings or the recent political assassinations of Melissa Hortman, a Minnesota lawmaker, and her family.

On September 11, amidst this vibrant public discourse, Plaintiff reposted another person's speech on his private Facebook account. That speech said:

> Let me preface this post by saying that violence is never okay and as much as I dislike someone and their cruel ideas, I would never want their life to be taken in an act of violence. Democracy should be built on ideas, not force. But I AM going to say this: If anyone thinks that a reasonable price for the second amendment is countless innocent lives, and then that person has the cold-heartedness and audacity to say that empathy is likened to a social disease, they will get no protracted sympathy from me. Unfriend me if you don't like hearing this simple truth. I'll never advocate for violence in any form, but it sounds to me like karma is sometimes swift and ironic. As Kirk said, "play certain games, win certain prizes."

> Moreover, the disgusting double standard for those on the "other side of the political line" is insane. Where was the outrage from the conservatives when Melissa Hortman, her husband, and even their dog was murdered in an act of political violence? Where were the thoughts and prayers from those who are outraged now? And why is there already a call from certain conservatives for retribution and violence? Doesn't that say too much about what cruelty awaits in their vengeance?

> Maybe you think I'm cruel too, but I'll say this also – I truly grieve for Kirk's family and friends. No one deserves to go through tragic loss like that. No one should be gunned down – not a school child, not an influencer, not a politician – no one. But am I going to allow people to make a martyr out of a flawed human being whose rhetoric caused notable damage? Not a chance.

Dr. Bregy's post is undoubtedly protected by the First Amendment. To start, his post was as a "citizen" and not "pursuant to [his] official duties" at Clemson. *Garcetti*, 547 U.S. at 421. Clemson issues and maintains official social media accounts. *See* Bregy Decl. at ¶ 9. But Dr. Bregy does not operate, or even have access to, any of those official accounts, and the speech that got him fired was posted to his own, personal Facebook account. *Id.* at ¶¶ 7–11. As the Fourth Circuit has explained, an employee's decision to post speech on Facebook (or other social media platforms) weighs strongly in favor of First Amendment protection because it "suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context." *Liverman v. City of Petersburg*, 844 F.3d 400, 409–10 (4th Cir. 2016) ("[W]e find it significant that the officers chose Facebook as the forum for their communication."). Indeed, courts overwhelmingly agree that employees' posts to personal social media accounts trigger First Amendment protection. *See, e.g.*, *Oakes Farms Food & Distribution Servs., LLC v. Adkins*, --- F.4th ----, 2025 WL 2658447, at *4 (11th Cir. Sept. 17, 2025) ("When posting about controversial political topics on his personal Facebook page . . . [plaintiff] was speaking as a citizen on matters of public concern."); *Hedgepeth v. Britton*, --- F.4th ----, 2025 WL 2447077, at *4 (7th Cir. Aug. 26, 2025) (Facebook post was made as private citizen); *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 905 (9th Cir. 2021) (same). That is unsurprising, given the Supreme Court's recent ruling that social media posts of public employees—even elected officials—do not usually reflect the views of the state or employer. *See, e.g.*, *Lindke v. Freed*, 601 U.S. 187, 197–200 (2024) (ruling that "social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media").

It is equally clear Dr. Bregy posted on "a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky*, 216 F.3d at 406. Dr. Bregy's post deliberately engaged with urgent and ongoing discourse about *several* matters of public concern: political violence, gun violence, democracy, and empathy. Because Plaintiff's speech was as a

citizen (not a government employee) and on a matter of public concern, it is protected by the First Amendment.

B.    <u>Dr. Bregy was fired because of the content of his Facebook post.</u>

Clemson's termination letter leaves no doubt: Dr. Bregy was fired because of his protected speech.

> *Your dismissal is a result of the following misconduct*: In the aftermath of Charlie Kirk's murder on September 10, 2025, in an outdoor area on a college campus in front of thousands of students, you reposted to your social media account the following: "Unfriend me if you don't like hearing this simple truth. I'll never advocate for violence in any form, but it sounds to me like karma is sometimes swift and ironic. As Kirk said, 'play certain games, win certain prizes.'"

Bregy Decl., Ex. C (emphasis added). In fact, the Provost acknowledged Dr. Bregy's strong reviews as a classroom professor, confirming that Dr. Bregy's performance was satisfactory. *See* Bregy Decl. at ¶ 19.

C.    <u>The *Pickering-Connick* balancing test heavily favors Dr. Bregy.</u>

Because Plaintiff's speech is protected, the burden shifts to Defendants to "justify[] the discharge on legitimate grounds." *Rankin*, 483 U.S. at 388; *see also Harnishfeger v. United States*, 943 F.3d 1105, 1115 (7th Cir. 2019) ("[T]he public employer has the burden of showing by a preponderance of the evidence that [the *Pickering*] balance weighs in its favor."). Ultimately, "[w]hether the employee's interest in speaking outweighs the government's interest is a question of law for the court." *Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014).

Defendants cannot satisfy their burden. Plaintiff's right to speak on a matter of public concern, as a university professor, occupies the highest rung of First Amendment values and far outweighs any alleged interest claimed by Defendants.

*1. Dr. Bregy's speech is maximally protected by the First Amendment.*

To start the balancing test, the Court must first "determin[e] the degree of protection the speech warrants, i.e., the level of importance the speech has in the community." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 977 F.3d 530, 538 (6th Cir. 2020); *see also Connick*, 461 U.S. at 150 ("[T]he state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression."). As the Third Circuit has explained, the *Pickering* inquiry involves "a sliding scale" where "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Miller v. Clinton Cnty.*, 544 F.3d 542, 549 n.2 (3rd Cir. 2008). To appraise the employee's interests, courts look at the speech's "general content and the context in which it was made." *Noble v. Cincinnati & Hamilton Cnty. Pub. Library*, 112 F.4th 373, 382 (6th Cir. 2024); *see also Vallecorsa v. Allegheny Cnty.*, 2022 WL 16950446, at *6 (W.D. Pa. Nov. 15, 2022) ("[T]here are two driving considerations: content and context." (citing *Rankin*, 483 U.S. at 388)).

Here, Plaintiff's personal Facebook post warrants maximal protection. Regarding content: the post was about a hotly debated political topic and thus "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *see, e.g.*, *Noble*, 112 F.4th at 382–83 (holding that library employee's "very controversial" and "highly distasteful" Facebook post opposing Black Lives Matter was entitled to "significant First Amendment weight" and "outweighed the Library's claimed . . . interest"). Indeed, a federal court has already ruled in favor of a South Dakota professor who was fired because of his Facebook post about Charlie Kirk. *See Hook*, 2025 WL 2720978, at *1. The context—posting on a social media platform—equally demands maximal protection. *See Liverman*, 844 F.3d at 409–10 ("Facebook is a dynamic medium through which users can interact and share news stories or opinions with members of their community.").

Therefore, to meet their burden and override Plaintiff's strong First Amendment protections, Defendants must produce compelling evidence of "an equally substantial workplace disruption," *Id.* at 411 (striking down police department social media policy under *Pickering*).

2.  *Defendants have no legitimate interest in punishing Dr. Bregy's speech.*

A government employer has a legitimate interest "in controlling the operation of its workplaces" and "promoting the efficiency of the public services it performs through its employees." *Lane v. Franks*, 573 U.S. 228, 236–37 (2014). Legitimate interests include concerns about whether the speech "impairs . . .  harmony among co-workers," or "has a detrimental impact on close working relationships." *Rankin*, 483 U.S. at 388. But to justify the termination of a public employee, "a public employer must *with specificity*, demonstrate the speech at issue" undermined a legitimate interest. *Henry v. Johnson*, 950 F.3d 1005, 1012 (8th Cir. 2020) (citations omitted) (emphasis added).

For three reasons, Defendants' interests are minimal, at best. To start, none of the *Pickering* factors that the Fourth Circuit has identified in *Ridpath* establish an interest in firing Dr. Bregy. Next, the decision betrays the University's own stated interest in upholding First Amendment values and protecting speech, even when it is unpopular. And finally, even conceding that Dr. Bregy's post ignited a social media firestorm that exerted tremendous pressure on the University, binding Fourth Circuit law forbids reliance on external, public outcry as a legitimate basis for firing a government employee for engaging in protected expression.

i.  The *Ridpath* factors do not justify Defendants' decision to fire Plaintiff.

Defendant Jones's dismissal letter states that Dr. Bregy was terminated because his Facebook post "poses a reasonable threat of disruption to the University's ability to carry out its teaching and other responsibilities." Bregy Decl., Ex. C. But to satisfy *Pickering*, a government employer's harms must be "real, not merely conjectural," *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454, 475 (1995), and "must be supported by some evidence, not rank speculation or bald allegation," *Nichols v. Dancer*, 657 F.3d 929, 934 (9th Cir. 2011) (citing *Gustafson v. Jones,* 290 F.3d 895, 909 (7th Cir. 2002) ("*Pickering* balancing is not an exercise in judicial speculation.")); *Kinney v. Weaver,* 367 F.3d 337, 363 (5th Cir. 2004) ("[E]ngaging in *Pickering* balancing is not like performing rational basis review, where we

uphold government action as long as there is some imaginable legitimate basis for it."). To "outweigh" Dr. Bregy's significant First Amendment rights, Clemson must do more than vaguely wave at the *Pickering* standard—it must prove "*with specificity*, [how] the speech at issue created workplace disharmony, impeded the plaintiff's performance, or impaired working relationships." *Henry*, 950 F.3d at 1012 (emphasis added); *see also Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1143 (9th Cir. 2025) (ruling for plaintiffs where evidence of disruption "lack[ed] specificity").

Here, the evidence belies any claim that the *speech itself* "(1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; [or] (9) abused the authority and public accountability that the employee's role entailed." *Ridpath*, 447 F.3d at 317 (listing "[f]actors relevant to th[e] [*Pickering*] inquiry").

(1) Dr. Bregy is supervised by the leaders of his Department, Dr. Debora Rodrigues and Dr. David Freedman. He also has two faculty advisors—Brian Powell and Alex Pullen. None expressed concerns about Dr. Bregy's post or were impaired in their ability to supervise Plaintiff. *See* Bregy Decl. at ¶¶ 17–18; Freedman Decl. at ¶ 21.

(2) Dr. Bregy has been overwhelmingly and unanimously supported by his colleagues. Dr. Bregy's post has not caused division within the faculty. *See* Freedman Decl. at ¶ 21. Defendants' decision to fire Dr. Bregy, however, "sent shockwaves through the faculty, triggered an emergency meeting of the faculty senate, and has fractured the faculty's trust and confidence in the Provost, University President, and Board of Trustees." *Id.* at ¶ 21(d).

(3) Dr. Bregy's post did not damage any close, personal relationships.

(4) Dr. Bregy is responsible for teaching and doing research. As Dr. Freedman noted, "Dr. Bregy is a leading climate scientist, and the value of his peer-reviewed research does not depend

on the broad appeal of his political views." *Id.* at ¶ 21(f). Nor were his teaching responsibilities interrupted. Dr. Bregy had no scheduled classes between his post and his firing. The support he has received from current students, including a member of Clemson College Republicans, demonstrates that his classes would not have been disrupted. For example, one current student reached out to say,

> I am very sorry about what happened to you at Clemson, I appreciate the way that you are trying to make the world a better place, and I am very sad that my time as your student as been cut short. I think that you are very brave and I hope that you continue to speak out for what is right.

Bregy Decl. at ¶ 28.

 (5) Dr. Bregy's post did not interfere with the operation of Clemson University. That said, his termination did. As Dr. Freedman explains, "his firing also created chaos over who would fill his teaching duties. Although several faculty have since stepped up to do so, they do not have anywhere near the same level of training that Dr. Bregy has. As such, this is a disservice to the students who signed up to learn from an expert in oceanography." Freedman Decl. at ¶ 21(d).

(6) Dr. Bregy's post did not undermine the mission of Clemson University, which has long committed itself to a place where students are exposed to a diversity of thought and opinion. Dr. Bregy's termination, however, was irreconcilable with the University's interest in "guarantee[ing] all members of the University community the broadest possible latitude to speak, write, listen, challenge, and learn." *See infra* Arg. II.C.2.ii.

(7) Dr. Bregy's post was communicated publicly through his personal Facebook account. Bregy Decl. at ¶ 7.

(8) Dr. Bregy's post did not conflict with his institutional responsibilities. *See supra*, (4). In fact, by acknowledging (by unanimous vote) that "concerns about civility and mutual respect can *never* be used as a justification for closing off discussion of ideas, however offensive or

disagreeable those ideas may be to some members of our community," *infra*, the Board of Trustees has invited university faculty to speak their mind.

(9) Unlike a police officer or other public servant whose job depends on community trust, Dr. Bregy's authority as a climate science professor and researcher depends on his intellectual and academic bona fides—not his social media posts or political views. *See* Freedman Decl. at ¶ 21(f) ("Dr. Bregy is a leading climate scientist, and the value of his peer-reviewed research does not depend on the broad appeal of his political views.").

In sum: none of the *Ridpath* factors support the University's decision to dump a critical faculty-member. Dr. Bregy's Facebook post did no internal harm, and his dismissal undermined the University's mission, fractured faculty trust in University administration, betrayed its commitment to free speech, and robbed its students of an opportunity to learn from the University's only oceanographer.

> ii. Clemson University has an affirmative governmental interest in protecting "free speech, expression, and inquiry."

The Fourth Circuit's list of *Pickering* factors is non-exhaustive. *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 252 (4th Cir. 2016). Other governmental interests can bear on the analysis. *Id.*

Here, Clemson's own interests weigh against dismissal. Public universities like Clemson have a governmental interest in cultivating and protecting diversity of opinion, not enforcing coercive conformity. As Justice Alito explained in *Mahanoy Area School District*, "public schools have *the duty* to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government." 594 U.S. 180, 195 (2021) (Alito, J., concurring) (emphasis added); *see also* Keith E. Whittington, *What Can Professors Say in Public? Extramural Speech and the First Amendment*, 73 Case W. Res. L. Rev. 1121, 1168 (2023) ("The government's legitimate interest in holding university professors to a standard of being community role models is negligible.").

23

By firing Dr. Bregy, Defendants violated their own state interest in protecting free speech. On February 3, 2023, the Clemson University Board of Trustees unanimously adopted a resolution committing the University to protecting and upholding "free speech, expression, and inquiry."[21] That statement formally adopted the core principles articulated in the "Report of the Committee on Freedom of Expression" at the University of Chicago, which "guarantees all members of the University community the broadest possible latitude to speak, write, listen, challenge, and learn."[22] The Report powerfully concludes that "it is not the proper role of the University to attempt to shield individuals from ideas and opinions they find unwelcome, disagreeable, or even deeply offensive," and warns that "concerns about civility and mutual respect can *never* be used as a justification for closing off discussion of ideas, however offensive or disagreeable those ideas may be to some members of our community." *Id.*

Violations of the Report are not, *ipso facto*, violations of the First Amendment. That said, the Court—in balancing the government's interest under *Pickering* against Plaintiff's speech rights—must weigh the University's legal, civic, and publicly-stated interest in providing maximal protections for speech, including disfavored speech.

### iii.    Public outcry is not a legitimate basis for termination.

Not every disruption of a government employer can justify the suppression of speech. Rather, "[t]he *Pickering* balance takes account of *legitimate* interests only." *Kinney*, 367 F.3d at 365 n.33 (emphasis added). To justify adverse employment reaction under *Pickering*, the government's asserted interest must be tethered to a disruption that is *internal*—not external—to the workplace. *See, e.g.*, *Berger v. Battaglia*, 779 F.2d 992, 1000–01 (4th Cir. 1985); *Melton v. Forrest City*, 147 F.4th 896, 903 (8th Cir. 2025). Public outcry alone cannot justify suppressing or punishing speech. *Goza v. Memphis Light, Gas & Water Div.*, 398 F. Supp. 3d 303, 320 (W.D. Tenn. 2019) ("The idea that the government should be permitted to censor speech in order to

---

[21] *See supra*, n.5

[22] *See supra*, n.6.

avoid public outcry was raised and dismissed in the Civil Rights Era."). To be relevant under *Pickering*, there must be a direct and nonspeculative nexus between the alleged harm and the employee's duties. *See Damiano*, 140 F.4th at 1146 (doubting the relevance, under *Pickering*, of "complaints from individuals who have no connection to the District . . . [or] from former students and individuals who have no connection to the school but reside within the District's service area"). Indeed, as several courts have observed, holding otherwise would "run the risk of constitutionalizing a heckler's veto." *Melton*, 147 F.4th at 903; *Flanagan v. Munger*, 890 F.2d 1557, 1566–67 (10th Cir. 1989) ("The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future."); *see also Feiner v. New York*, 340 U.S. 315, 320 (1951) ("[T]he ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker.").

In *Berger v. Battaglia*, the Fourth Circuit made clear that "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself,* of the public employer's *internal* operations and employment relationships." 779 F.2d at 1000 (emphasis added). In so holding, the court unequivocally rejected the notion that "threatened disruption by [members of the public] reacting to public employee speech . . . [can] serve as justification for public employer disciplinary action directed at that speech." *Id.* at 1001.

*Melton v. Forrest City*, a case decided last month by the Eighth Circuit, illustrates that rule in a modern context. There, a firefighter was fired for "repost[ing] a black-and-white image on Facebook that depicted a silhouette of a baby in the womb with a rope around its neck." *Melton*, 147 F.4th at 900. It was undisputed that the post caused a "huge firestorm" in the public and press. Evidence showed, for example, that "the fire chief's phone had been 'blowing up,'" and that "phone lines were jammed with calls from angry city-council members and citizens." *Id.* at 901–02. Nevertheless, the Eighth Circuit concluded that "[a]t best, the evidence of disruption [wa]s thin," because "there was no disruption of training at the fire department, or of any fire

service calls, because of the post." *Id.* at 903. Thus, because "there was no showing that Melton's post had an impact on the fire department *itself*," the Eighth Circuit reversed in favor of the plaintiff. *Id.* (emphasis added).

Finally, the ruling two weeks ago in *Hook v. Rave* shows how this rule applies to a virtually identical set of facts. *Hook* involved a professor at the University of South Dakota who, like Dr. Bregy, was fired because of the content of a private Facebook post. *Hook*, 2025 WL 2720978, at *1. Hook's Facebook post said, in part, "I don't give a flying f*** about this Kirk person . . . I have no thoughts or prayers for this hate spreading Nazi. A shrug, maybe." *Id.* After the post was picked up by conservatives on the internet, political pressure was put on the university and the public started calling for Hook's removal. *Id.* Eventually, the university placed him on administrative leave. *Id.* at *2.

Hook filed a First Amendment case, and after applying the *Pickering* analysis, the district court entered a TRO reinstating Hook's employment. The court explained that although "hundreds of calls and message were made to the Board of Regents and/or the University of South Dakota commenting negatively regarding the comment or calling for the removal of Professor Hook, . . . Defendants [did] not demonstrate[] that there was any disruption to on-campus activities, Hook's teaching lessons, or the University's operations." *Id.* at *4. The court added that, "without more, 'such vague and conclusory concerns . . . runs the risk of constitutionalizing a heckler's veto.'" *Id.* at *4 (quoting *Melton*, 147 F.4th at 903).

The law compels the same outcome here. Despite the maelstrom on social media (much of it created and perpetuated online by a handful of politicians), there is simply no evidence that Dr. Bregy's Facebook post undermined, disrupted, or even implicated his duties *at Clemson*. However trying it must have been for Defendants to confront the online mob and its 280-character pitchforks, the First Amendment does not credit Clemson's impulse to capitulate as a "legitimate" interest. The Constitution requires a stronger spine than that.

**II.     Plaintiff will suffer irreparable harm absent preliminary relief.**

Plaintiff will suffer several irreparable harms unless his employment is reinstated pending the final resolution of this case.

1.     *Constitutional violation*. First Amendment injuries are definitionally irreparable. *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) (holding that First Amendment violations are "*per se* irreparable injur[ies]"); *Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[T]he alleged violation of a constitutional right triggers a finding of irreparable injury."). Thus, because Plaintiff is likely to prevail on the merits of his First Amendment claims, *see supra* Part I & II, he has also demonstrated irreparable harm sufficient to warrant a preliminary injunction. *See Bauer v. Summy*, 568 F. Supp. 3d 573, 604–05 (D.S.C. 2021) (explaining that, in such cases, "the two prongs of the preliminary injunction threshold merge into one . . .  in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." (quoting *Page v. Cuomo*, 478 F. Supp. 3d 355, 364 (N.D.N.Y. 2020)). Unlike an ordinary wrongful termination suit, which can be adequately remedied with monetary damages, a constitutional claim for First Amendment retaliation calls for preliminary injunctive relief. *See, e.g.*, *Hook*, 2025 WL 2720978, at *5 (granting temporary injunction to reinstate professor placed on administrative leave after remarking, on Facebook, "I don't give a flying f*** about this Kirk person"); *Greer v. Amesqua*, 22 F. Supp. 2d 916, 925 (W.D. Wis. 1998) ("The Seventh Circuit continues to interpret *Elrod*'s waiver of the requirement to make an explicit showing of irreparable harm as applicable in all types of First Amendment discharge cases.")

2.     *Stalled Research*. When a funded researcher cannot complete their project, the harm is irreparable: because the resulting "diminished career prospects" and "reputational harm" are too difficult to quantify, money damages are inadequate to make the plaintiff whole. *Doe v. Noem*, 778 F. Supp. 3d 1151, 1163 (W.D. Wash. 2025) (granting preliminary injunction where plaintiff "cannot carry out research on his grant-funded doctoral program without [preliminary relief]"); *Liu v. Noem*, 780 F. Supp. 3d 386, 403 (D.N.H. Apr. 29, 2025) (holding that plaintiff's

"inability to continue his research because of [defendants' conduct] has significant and irreparable consequences for his academic trajectory").

3.    *Time-Limited Grant Opportunity.* The loss of a future career opportunity—like Plaintiff's NSF Career grant opportunity—is similarly irreparable. *See, e.g.*, *Lujan v. U.S. Dep't of Educ.*, 664 F. Supp. 3d 701, 721 (W.D. Tex. 2023) (holding that loss of future scholarship opportunity is irreparable); *Doe 1 v. Bondi*, 785 F. Supp. 3d 1268, 1285 (N.D. Ga. 2025) "[T]he prospect of . . . [plaintiffs] losing their grant-funded work . . . are likewise irreparable."). Unlike a normal wrongful termination case, Plaintiff's future career opportunities—whether at Clemson or elsewhere—depend on his ability to secure external funding. Thus, harms to his ability to do so are, in this instance, irreparable. *See S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) ("While economic injuries are usually insufficient to justify injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'" (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

4.    *Professional Reputation.* Defendants' damage to Plaintiff's professional reputation is similarly irreparable. *See, e.g.*, *S. Educ. Found.*, 784 F. Supp. 3d at 72 ("Reputational injury can also suffice to establish irreparable harm."); *Mercy Health Servs.-Inc. v. Efstratiadis*, 579 F. Supp. 3d 1096, 1107 (N.D. Iowa 2022) ("What is sure, however, is that loss of professional reputation can constitute an irreparable injury." (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)).

## III.    The balance of equities and public interest strongly favor injunctive relief.

The remaining *Winter* factors also support a preliminary injunction. The balance of equities and public interest "merge" when the government is the opposing party. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024). A government entity "is in no way harmed" by a preliminary injunction that prevents it from violating the constitution. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (quotes

omitted). Likewise, it is "well-established that the public interest favors protecting constitutional rights." *Id*. Accordingly, the public interest and balance of equities are "established when there is a likely First Amendment violation," *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). This is unsurprising, given "our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

## CONCLUSION

The record establishes that Plaintiff is overwhelmingly likely to prevail on the merits and will experience irreparable harm if forced to wait until the end of the case to obtain relief. To allay that harm, this Court should:

1. Order Defendants to immediately and fully reinstate Plaintiff's employment status at Clemson University;

2. Order Defendants to amend Plaintiff's employment records to remove any adverse action arising from the events described herein; and

3. Enjoin Defendants from disparaging Plaintiff on any basis related to the protected speech in question to any future potential employer.

Dated: October 6, 2025

Respectfully submitted,

*/s Allen Chaney*

Allen Chaney
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

*Attorney for Plaintiff*